UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK E. KNIGHTEN, JR.,

        Plaintiff,

vs.

JOHN M. McHUGH, et al,

        Defendants.
_____/

Case No. 14-CV-12351

HON. GEORGE CARAM STEEH

<u>ORDER GRANTING DEFENDANTS', JOHN M. McHUGH AND UBT, MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S CLAIMS AND DENYING AS MOOT DEFENDANT JOHN M. McHUGH'S MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT UBT'S CROSS-CLAIM (DOC. 68)</u>

This matter is before the court on summary judgment motions brought by co-defendants', John M. McHugh (McHugh) and Unified Business Technologies, Inc. (UBT). Plaintiff, Frank E. Knighten, Jr., brought this case under the Age Discrimination in Employment Act, 29 U.S.C. 633a (ADEA), the Michigan Elliot-Larsen Civil Rights Act, M.C.L. § 372101 *et seq.* (ELCRA), and 42 U.S.C. 1981, *et seq.* against defendants McHugh and UBT. Plaintiff alleges that both defendant McHugh, in his position as Secretary of the United States Army, and defendant UBT unlawfully retaliated against plaintiff by refusing him employment because plaintiff engaged in the protected activity of testifying at an Equal Employment Opportunity (EEO) fact-finding hearing. Plaintiff further alleges that defendant UBT denied plaintiff employment based on his race. Both defendants McHugh and UBT filed motions for summary judgment as to these claims, and the court heard oral argument on April 14, 2016.

-1-

In addition, UBT previously filed a cross-claim against McHugh claiming that if UBT is found liable to plaintiff on all or part of his claims, McHugh should be held equally liable. McHugh filed, as part of his consolidated motion for summary judgment, a motion for summary judgment as to UBT's cross-claim as well.

For the reasons stated in the court's opinion, both defendants' motions for summary judgment are GRANTED.

## STATEMENT OF FACTS

Defendant John M. McHugh is the Secretary of the U.S. Army. The Army contracted with Technical Professional Services, Inc. (TPS) to place approximately a dozen employees at the U.S. Army's Tank Automotive and Armament Command in Warren, Michigan (TACOM). Plaintiff, an African American man, was hired by TPS as one of three welders on October 14, 2011. James Douglas (Douglas) is an Army employee who oversaw the three TPS welders. Douglas kept daily logs of significant activities. Douglas managed plaintiff's workflow, but he did not have the authority to discipline plaintiff.

Douglas recorded many instances of plaintiff's tardiness. Douglas' records show that plaintiff was late 24 times between October 2011 and October 2012, on one occasion by one-half hour, on three occasions by one hour, and once by two hours. Douglas' log shows that he spoke with plaintiff about his attendance on several occasions throughout that year. On October 11, 2012, Douglas and Robert Washburn (Washburn), who oversaw Douglas' department, met with plaintiff to discuss his attendance. Washburn spoke with plaintiff about his attendance on another occasion as well. Both Douglas and Washburn offered plaintiff the option to start later, but plaintiff

refused. Douglas also received several complaints regarding plaintiff's attitude and verbal confrontations between plaintiff and other workers. Plaintiff says that he got his work done and that his schedule was not a problem.

In July 2012, Charles McCleod (McCleod) filed an EEO complaint with TACOM's EEO Office alleging that Douglas retaliated against McCleod because of his age. On October 24, 2012, Douglas was notified that plaintiff would testify at McCleod's fact-finding conference. On November 15, 2012, both plaintiff and Douglas testified at McCleod's fact-finding conference, but neither heard the testimony of the other. Plaintiff says that it was at this point that his relationship with Douglas changed, and, while his performance at work had not been a problem before, Douglas was now retaliating against plaintiff for his testimony.

On October 12, 2012, TPS received documentation from the Unemployment Insurance Agency (UIA) that plaintiff had filed a claim on October 4, 2012, and TPS would be charged for the benefits. TPS wrote back to the UIA explaining that plaintiff was employed full-time with TPS and was therefore not eligible for the benefits. TPS president Arnie Rodriguez (Rodriguez) met with plaintiff on October 31, 2012. At that meeting, plaintiff denied filing the claim. Rodriguez then began investigating plaintiff. On November 2, 2012, Douglas spoke with Jim Soltez (Soltez), one of TPS's local representatives on the contract for which plaintiff was hired, about removing plaintiff for his poor attendance. Soltez told Douglas about Rodriguez's investigation into plaintiff's alleged false filing for UIA benefits and TPS may be letting plaintiff go for that anyway. On November 8, plaintiff filed a claim with the Michigan Department of Civil Rights

claiming TPS was harassing him about the alleged false filing for UIA benefits. This claim was dismissed for insufficient evidence.

Plaintiff continued to work for TPS at TACOM until January 18, 2013 when TPS lost its 8A, minority owned business, status. All of the TPS employees on that contract, including plaintiff, were laid off. UBT then received the Army contract. Roy Riggleman was the Director of Recruiting for UBT at that time. In January 2013, Riggleman asked Paul Santarelli to hand out his business cards to TPS workers. Several TPS employees contacted Riggleman about returning to TACOM. When TPS appealed the decision to revoke their 8A status, Riggleman was told to cease communication with the TPS workers, and he did. On February 25, 2013, Riggleman was told that TPS lost their appeal and that he could start hiring for the TACOM contract. Riggleman reached out to those workers he had previously been in contact with and asked them to come in and fill out an application to begin work on February 26, 2013. Riggleman asked those employees to contact other former TPS employees they knew to also fill out applications and begin working. Plaintiff claims that he was the only TPS employee not hired back by UBT. Defendants respond that Luke Franklin and Don Kimberlin, two of the other TPS workers, were also not hired back because of performance problems.

On February 26, 2013, plaintiff learned from his former TPS co-worker Lou Frye that other former TPS workers were back to work at TACOM for UBT. Plaintiff called Riggleman to inquire about a job. Riggleman told plaintiff that Douglas did not want plaintiff back and that there were no welding positions currently available. Douglas had previously called Riggleman to express his dissatisfaction with plaintiff. Immediately after speaking with Riggleman, plaintiff sent a text message to Douglas asking if plaintiff

could return to work. Douglas did not respond. On March 20, 2013, plaintiff sent a second text message to Douglas saying that, by not hiring him back, Douglas was in violation of the Federal Acquisition Regulations (FAR). Again, Douglas did not respond.

On May 29, 2013, plaintiff contacted the EEO at TACOM. He received a Notice of Right to File a Formal EEO Complaint on June 25, 2013 and filed a formal complaint against the Army on July 9, 2013. On February 17, 2014, plaintiff requested a final agency decision. The Army failed to issue that decision within 60 days, and, on June 16, 2014, plaintiff filed the instant suit.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The

evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## ANALYSIS

### A. Retaliation Claim Against Defendant McHugh (Count I)

*1. Exhaustion of Administrative Remedies*

The ADEA makes it "unlawful for an employer to discriminate against any of his employees or applicants for employment [or] for an employment agency to discriminate against any individual . . . because such individual, member or applicant for

membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C.A. § 623(d). In defendant McHugh's motion for summary judgment, he argues several reasons why summary judgment is appropriate as to plaintiff's retaliation claim under the ADEA.

Defendant McHugh first argues that plaintiff was not an employee of the Army or applicant for employment with the Army under the ADEA. The court does not need to decide this question because, as set forth below, even if plaintiff was an Army employee for purposes of the ADEA, he did not exhaust his administrative remedies, and summary judgment should, therefore, be granted. Specifically, McHugh argues that plaintiff failed to initiate contact with a counselor within 45 days of the alleged discriminatory activity as required by 29 C.F.R. § 1614.105(a).[1] McHugh claims that plaintiff learned of the alleged discrimination on February 26, 2013 when he called Roy Riggleman and was told that he would not be returning to work on the TACOM project. (Doc. 62-3, Pg ID 1461). After that conversation plaintiff did not initiate contact with a counselor, the EEO office, until May 29, 2013, 92 days after learning of the alleged discrimination. (Doc. 48-34, Pg ID 618).

Plaintiff agrees that 29 C.F.R. § 1614.105(a) governs this matter but insists that plaintiff did initiate contact with the EEO within 45 days of learning of the alleged discrimination. Plaintiff denies learning of the alleged discrimination on February 26,

---

[1] Both parties agree that the "by-pass" option of 29 C.F.R. § 1614.201 does not apply because plaintiff did not file a notice of intent to sue.

2013. Rather, plaintiff argues that he merely learned that he would not be returning to work for the Army on that date, not that a discriminatory intent motivated that decision. Instead, plaintiff proffers a date of March 20, 2013 as the date he learned of the discriminatory motive. It was on that date that plaintiff contacted Douglas a second time to inform Douglas that the Army was obligated to rehire plaintiff under the Federal Acquisition Regulations (FAR). (Doc. 56-26, Pg ID 1399).

The 6th Circuit Court of Appeals has established that "[t]he 45–day period begins to run when an employee reasonably should have been aware of the employer's decision." *Lord v. Holder*, 568 F. App'x 435, 437 (6th Cir. 2014) (citing *EEOC v. United Parcel Serv., Inc.*, 249 F.3d 557, 562 (6th Cir. 2001); *see also Amini v. Oberlin Coll.*, 259 F.3d 493, 499 (6th Cir. 2001). On February 26, 2013, plaintiff was aware of the Army's position that he should not be hired when plaintiff spoke with Roy Riggleman who told him of UBT's decision not to hire him back. (Doc. 62-3, Pg ID 1461). The 45 day period, therefore, began running on February 26, 2013.

Plaintiff also disputes the day on which he initiated contact with the EEO official. Plaintiff points to a letter from Mark E. Reed, the Director of the Department of the Army, which states that plaintiff made initial contact with the EEO on April 24, 2013. (Doc. 56-18, Pg ID 1358). The Army argues that April 24, 2013 was simply a typographical error, and plaintiff actually made first contact with the EEO on May 29, 2013 (Doc. 56, Pg ID 577). Again, it doesn't matter whether plaintiff's implausible suggestion is accurate. Even if plaintiff did contact the EEO on April 24, 2013, the clock started running on February 26, 2013. Using that time line, plaintiff did not contact the

EEO until 57 days after learning of UBT's decision, which is outside of the 45 day period. Plaintiff did not timely exhaust his administrative remedies.

*2. The Federal Acquisition Regulations (FAR) Do Not Operate to Extend the Time Within Which Plaintiff had to Initiate Contact with the EEO*

Plaintiff proposes May 26, 2013 as an alternative date on which the 45 day clock started running. Plaintiff reasons that under 29 C.F.R. § 1614.105(a) he had 45 days from the "effective date" of a "personnel action" in which to initiate contact with the EEO. Under FAR, UBT had 90 days from the start of the contract to make an offer of employment to plaintiff. (Doc. 56-4, Pg ID 53). According to plaintiff, the last day of the 90 day period provided by FAR should be seen as the "effective date" of a "personnel action." The contract was awarded on February 25, 2013. Ninety days from that date is May 26, 2013. So, plaintiff argues UBT could have made an offer of employment to him any time before May 26, 2013, and the clock should not start running until this date expired. Importantly, plaintiff only raised this argument regarding FAR against McHugh, not UBT. There is no mention of FAR in the portion of plaintiff's brief addressing UBT's liability, even though UBT is the party who would be subject to FAR as it was the contractor hiring the former TPS employees. So, plaintiff effectively waived this argument as to UBT, and it clearly does not apply to McHugh. Nevertheless, as UBT noted during oral argument, under FAR, UBT should have been provided with a list of TPS employees by either TPS or the government. FAR 22.1204. UBT claims they never received a list of TPS employees, and plaintiff offered no evidence indicating otherwise. Moreover, FAR requires that plaintiff bring his complaint to the Department of Labor, which he has not. FAR 22.1206. FAR also allows a subsequent contractor, in this case

UBT, to hire fewer employees if the contract so requires. FAR 22.1203-6. In this case, the government contract that UBT bid on required only two welders. So, when UBT was awarded the contract, it hired two welders. On February 26, 2013, Riggleman specifically told plaintiff that UBT had filled all of the contract positions and would not be hiring plaintiff. The clock began running on that date because it was on that date that plaintiff "reasonably should have been aware of [UBT's] decision." *Lord*, 568 F. App'x at 437.

### 3. Equitable Tolling

Plaintiff also argues that, even if he did not initiate contact with EEO within the 45 day time limit, the time limit should be tolled pursuant to 29 C.F.R. § 1614.105(a)(2), which allows tolling when an employee

> was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits. *Id.*

Plaintiff, however, makes no attempt to establish facts that support the proposition that he was unaware of the time limit or was prevented from contacting the EEO despite due diligence and due to circumstances beyond his control. Additionally, as described above, it is clear that plaintiff was aware that the discriminatory matter or personnel action occurred on February 26, 2013 after his phone call with Roy Riggleman. So, tolling is not proper here. The court grants summary judgment as to this count.[2]

---

[2] The court does not need to decide whether plaintiff established a *prima facie* case for retaliation by demonstrating that there is a causal link between UBT's decision not to hire plaintiff and plaintiff's participation in McLeod's EEO hearing. Neither does the court have to decide whether the Army had legitimate business reasons to request

**B. Claims Against UBT**

*1. Elliott-Larsen Civil Rights Act Retaliation Claim Against UBT (Count III)*

ELCRA makes it illegal for two or more persons to:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

. . . .

(c) Attempt directly or indirectly to commit an act prohibited by this act.

. . . .

(f) Coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act. Mich. Comp. Laws Ann. § 37.2701 (West).

Plaintiff has the burden of establishing a prima facie case under ELCRA by showing 1) plaintiff engaged in the protected activity, 2) defendant knew of the plaintiff's involvement in the protected activity, 3) defendant then took an employment action adverse to plaintiff, and 4) there was a causal connection between the protected activity and the employment action. *Meyer v. City of Center Line*, 242 Mich. App. 560, 568-69 (2000).

Plaintiff claims that UBT violated ELCRA by refusing to hire him because of his participation in McCleod's EEO complaint, a protected activity. There is no dispute between the parties as to the first and third elements. UBT, however, argues that summary judgment is appropriate because plaintiff has not presented any evidence that

---

that plaintiff not return in as much as plaintiff did not exhaust his administrative remedies.

-11-

UBT knew of plaintiff's participation in McCleod's EEO complaint when UBT made its decision not to hire plaintiff back, and plaintiff has, therefore, not satisfied the second element of this test.

After examining the record, the court agrees with UBT that plaintiff does not allege any facts and the court finds no evidence in the record that UBT knew of plaintiff's involvement in McCleod's EEO complaint. Plaintiff testified several times that he did not know whether UBT knew of his participation in McCleod's EEO complaint. (Doc. 56-5, Pg ID 1092-92, 1104). Plaintiff did not allege any additional facts to support the claim that UBT acted with a discriminatory motive. In fact, plaintiff does not argue in his response to summary judgment that UBT knew of plaintiff's involvement in McCleod's EEO complaint when UBT was hiring TPS employees to work at TACOM. In his argument against McHugh, plaintiff admits that when "[t]he Army . . . told UBT that it did not want plaintiff back to work. UBT did not ask why," insinuating that UBT had no knowledge of Douglas' alleged discriminatory motives. (Doc. 56, Pg ID 960).

Instead, plaintiff argues a "cat's paw" theory of liability. In other words, plaintiff alleges that UBT was simply acting as a rubber stamp for what was ultimately Douglas' decision. *Staub v. Proctor*, 562 U.S. 411, 416 (2011); *Wells v. New Cherokee Corp.*, 58 F.3d 233 (6th Cir. 1995). The "cat's paw" theory prevents an employer from insulating itself from discrimination claims by claiming that it was acting through a supposedly neutral decision maker. Here, UBT is not claiming that it was acting through a neutral decision maker. UBT admits that the decision whether or not to hire plaintiff was its own. Riggleman testified that there were no positions available when plaintiff contacted him regarding employment with UBT, and that is why *UBT* did not hire plaintiff. Plaintiff did

not offer any evidence indicating that there were positions available when plaintiff applied. So, the "cat's paw" theory does not apply. Plaintiff has presented no evidence that UBT knew about plaintiff's participation in McCleod's EEO. Summary judgment is, therefore, appropriate as to this count because there is no genuine issue of material fact.

*2. Elliott-Larsen Civil Rights Act Race Discrimination Claim Against UBT (Count IV)*

M.C.L. 37.2202 provides as follows:

(1) An employer shall not do any of the following:

> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. Mich. Comp. Laws Ann. § 37.2202 (West).

Plaintiff may prove discrimination by direct or circumstantial evidence. *Sniecinski v. Blue Cross and Blue Shield of Michigan*, 469 Mich. 124, 132 (2003). Direct evidence is "'evidence which, if believed requires the conclusion that discrimination was at least a motivating factor in the employer's actions.'" *Id.* (quoting *Hazel v. Ford Motor Co.*, 464 Mich. 456, 462 (2001)). Where plaintiff's claim is based on circumstantial evidence, the court relies on the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under that analysis, plaintiff must first establish a *prima facie* case under this statute by showing 1) he is a member of a protected class, 2) he was qualified for the job and performed it satisfactorily, 3) despite his qualifications and performance, he suffered an adverse employment action, and 4) he was replaced by a person outside the protected class or was treated less favorably

than a similarly situated individual outside of his protected class. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). Should plaintiff satisfy the above elements, defendant has the burden of proving a legitimate, nondiscriminatory business reason for rejecting plaintiff. *Id.* Then, if defendant meets this burden, plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by defendant were a pretext for discrimination. *Id.*

Plaintiff claims that UBT refused to hire him, in violation of this statute, because he is African American. UBT seeks summary judgment arguing that UBT did not know that plaintiff was African American when it hired the other former TPS welders and not plaintiff. Riggleman testified that he had not heard of plaintiff before this suit was brought. (Doc. 56-10, 1258). Riggleman also testified that he knew Alexander Price, another African American employee, was African American "[j]ust by talking to him and by him sending his documentation to me, driver's license." (Doc. 56-10, 1244). Plaintiff argues that, from this testimony, it should be assumed that Riggleman also knew plaintiff was African American because Riggleman spoke to plaintiff over the phone. Plaintiff claims that Riggleman testified that he was often in the factory in which plaintiff worked and that "[t]he inference is that the two saw each other." (Doc. 56, Pg ID 964). Plaintiff cites to a portion of the record that is not relevant to the inference plaintiff is trying to draw. *(See* Doc. 56-5, Pg ID 1100). Contrary to what plaintiff claims, Riggleman testified that he only came to the factory once per month and did not keep a regular schedule. (Doc. 56-10, Pg ID 1244). Moreover, Riggleman was only at the factory to "troubleshoot, [if] somebody was getting in trouble . . . or if . . . one of the guys were . . .

messing up." *Id.* Riggleman also testified that he "really didn't stay there too long because they frown upon me talking to all my guys and them not doing work." *Id.*

Plaintiff offers no testimony nor evidence that he met Riggleman in person or spoke to him on the phone before February 26, 2013 when Riggleman told plaintiff that no positions were available and UBT would not be hiring plaintiff. (Doc. 56-5, Pg ID 1091-92). In addition, plaintiff has not produced evidence to contradict Riggleman's assertion that there were no positions available when plaintiff contacted him on February 26, 2013. So, even if Riggleman did learn because of plaintiff's voice that plaintiff was African American during that conversation, he could not have discriminated against him by not offering him a position because it is undisputed there were no positions available at that point.

As with Count III plaintiff simply does not offer any facts or evidence that lead the court to conclude that there is any basis for this Count. The inferences plaintiff asks the court to draw are based on a mere scintilla of evidence, which is not enough to support a claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Plaintiff also argues the same "cat's paw" theory in this Count that was argued in Count III, above, but for the same reasons, that is not applicable here either. Therefore, this Count is dismissed.

*3. 42 U.S.C. 1981 Race Discrimination Claim Against UBT (Count IV (sic))*

42 U.S.C. 1981 and the ELCRA are analyzed under the same framework. *See* Thompson v. City of Lansing, 410 F. App'x 922, 933 (6th Cir. 2011) (unpublished) (citing Jackson v. Quanex Corp., 191 F.3d 647, 657 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 and the [ELCRA] under the same standards as claims for race discrimination brought under Title VII")).

Plaintiff claims that UBT violated 42 U.S.C. 1981 by discriminating against him on the basis of race. Again UBT argues that it did not discriminate because it did not know plaintiff was African American. For the reasons set forth in Count IV above, this claim is also dismissed.

**D. Cross-Claim by Defendant UBT Against Defendant McHugh**

On October 14, 2015, UBT filed a cross-claim against McHugh arguing that Douglas, an employee or agent of McHugh, was in a position of power over UBT and directed UBT not to hire plaintiff. Because of this relationship, UBT requests that, if a jury finds UBT liable to plaintiff for any amount, McHugh should be held liable in an equal amount. McHugh argues that he is immune from this cross-claim as a governmental entity. In reply, UBT argues that McHugh has waived his immunity as to plaintiff's suit and should, therefore, also be understood to have waived any cross-claims arising out of that suit. The court has summarily dismissed all of plaintiff's claims, and these arguments are moot.

IT IS ORDERED that both defendants' motions for summary judgment are GRANTED.

IT IS FURTHER ORDERED that defendant McHugh's motion for summary judgment as to defendant UBT's cross-claim is denied as moot.

Dated:  May 6, 2016

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on May 6, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk